UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LAVATEC LAUNDRY TECHNOLOGY, GmbH, | | |
| Plaintiff, | | |
| v. | | No. 3:13cv00056 (SRU) |
| LAVATEC, INC., | | |
| Defendant. | | |

## MEMORANDUM OF DECISION AND ORDER

This case concerns a trademark infringement dispute between the plaintiff, Lavatec

Laundry Technology, GmbH ("LLT"), and the defendant, Lavatec, Inc. ("New Lavatec"), both

of which are engaged in the business of manufacturing, selling, and servicing commercial

laundry equipment.  LLT brings the action on its own behalf and as successor in interest to

Lavatec AG and Lavatec Wäschereimaschinen GmBH & Co. KG (collectively, "Lavatec

Germany") against New Lavatec for trademark infringement, false designation of origin, unfair

trade practices, unfair competition, and tortious interference with contractual relationships.[1]

New Lavatec brings counterclaims for the above causes of action as well as for misappropriation

of trade secrets.  LLT claims to own the rights to the trademark "Lavatec" and New Lavatec

claims to have acquired the mark following the United States bankruptcy of Lavatec Germany's

former wholly-owned U.S. subsidiary, Lavatec, Inc. ("Old Lavatec").

LLT commenced this lawsuit on January 11, 2013 against New Lavatec, and New

Lavatec filed counterclaims against LLT on July 26, 2013.  On September 16, 2013, LLT moved

---

[1] Lavatec Wäschereimaschinen GmBH & Co. KG was a manufacturing company owned and controlled by the holding company Lavatec AG.

to dismiss New Lavatec's counterclaims.  (doc. # 38).  New Lavatec moved for summary

judgment on all of LLT's claims on September 20, 2013.  (doc. # 44).  LLT filed a motion for

preliminary injunction against New Lavatec on October 9, 2013 (doc. # 49), and New Lavatec

filed a cross motion for summary judgment on October 18, 2013.  (doc. # 60).  LLT moved to

amend its complaint on December 23, 2013.  (doc. # 80).  In lieu of seeking the court's ruling on

each of those motions, the parties agreed to try the issue of ownership of the trademark in a

bench trial, which was held from May 19 to May 22, 2014.  Each of the parties also seeks

injunctive relief prohibiting the other from using the trademark.

     For the reasons set forth below, I conclude that plaintiff LLT is the owner of the

"Lavatec" trademark.  My findings of fact and conclusions of law are set forth below.

## I.      Factual Background

### A.   <u>The Lavatec Entities</u>

     Plaintiff LLT is a German company, owned by Wolf-Peter Graeser and Mark Thrasher,

that currently manufactures and distributes commercial laundry equipment under the Lavatec

mark.  (Test. of W. Graeser, May 19, 2014.)  LLT distributes its products in the United States

through a distributor, Lavatec Laundry Technology, Inc., which Graeser and Thrasher also own.

Defendant New Lavatec is a United States company that manufactures and distributes folding

machines bearing the Lavatec mark in the United States.  (Test. of P. Thompson, May 21, 2014;

Ex. 502.)  New Lavatec also services laundry equipment and sells parts and refurbished laundry

equipment to United States customers.  (*Id.*)  LLT and New Lavatec both claim to possess the

exclusive right to use the Lavatec mark in the United States, which they claim to have acquired

through their respective purchases of the assets of the former Lavatec entities, Lavatec Germany

and Old Lavatec.

Lavatec Germany was founded in 1986 by Gerhard Bernecker, who previously worked for Passat Laundry Systems ("Passat"), a Germany-based manufacturer of commercial laundry equipment.  (Test. of G. Bernecker, May 20, 2014.)  In early 1986, Bernecker and a former Passat manager, Samir Tadros, decided to form Lavatec.[2]  (*Id.*)  Bernecker was Lavatec Germany's president and chief executive officer from 1986 until 1988, but Tadros, who became president of Lavatec Germany in 1988, was the company's primary decision-maker and eventual majority owner.  (Test. of G. Bernecker, May 20, 2014; Test. of M. Thrasher, May 19, 2014; Exs. 612, 623.)  In January 1987, Tadros formed Old Lavatec, which was formally incorporated in the United States on February 4, 1987, as a wholly-owned subsidiary of Lavatec Germany. (Joint Trial Memo. Stipulation of Fact ¶ 6; Ex. 605.)

Neither the Lavatec mark nor any Lavatec products existed before 1986.  (Test. of G. Bernecker, May 19, 2014.)  That year, Lavatec Germany began designing and manufacturing industrial dryers and extraction presses, and, in 1987, began selling fully-assembled laundry machines.  (*Id.*)  Its customers included hospitals, retirement homes, colleges, industrial laundry service companies, hotels, airlines, railways, catering companies, and others around the world. (*Id.*)  Over the next several years, Lavatec Germany grew by expanding its production facilities, building new manufacturing plants, expanding office space, and acquiring competing commercial laundry manufacturing companies.  (*Id.*)  Lavatec Germany's highest grossing products were its tunnel washer systems, which comprised approximately 85% of all sales of Lavatec Germany and Old Lavatec.  (Test. of M. Thrasher, May 19, 2014; Test. of W. Graeser,

---

[2] Bernecker created the Lavatec name by combining the Latin word for wash, "lavare," and the name of another company in the laundry industry, Metutec.  (Test. of G. Bernecker, May 19, 2014.)  In January 1987, he hired a graphic design company to design the company's logo. (*Id.*)

May 19, 2014.)  Lavatec was also known for its dryers and extraction presses, which accounted for the majority of the remainder of the entities' sales.  (*Id.*)

Old Lavatec was the sole distributor of Lavatec products in the United States and also sold and serviced laundry systems that bore the Lavatec mark.  Until 1991, Lavatec Germany was the sole manufacturer of all Lavatec products and the only entity to affix the Lavatec mark to products sold in the United States.  (Stipulated at Trial, May 22, 2014.)  Over 95% of all parts sold by Old Lavatec came from Lavatec Germany.  (Test. of P. Thompson, May 20, 2014.)  After several years, Old Lavatec expanded beyond its role as Lavatec Germany's distributor and began to manufacture, assemble, and sell non-Lavatec laundry equipment.[3]  In 1991, Old Lavatec acquired BB&D, Inc., a Maine corporation that manufactured folding machines, and began to manufacture and sell folding machines under the Lavatec name in the United States.[4]  (Stipulated at Trial, May 22, 2014).  Also, from 1995 to 1997, Old Lavatec assembled washer extractors from parts shipped from Lavatec Germany, but stopped doing so after customers complained about the extractors' quality.  (Test. of M. Thrasher, May 19, 2014; Stipulated at Trial May 19, 2014.)  From 2005 until its bankruptcy in 2009, Old Lavatec sold folders manufactured in the United States by the WashEx company.  (Test. of P. Thompson, May 20, 2014; Ex. 500.)  To identify those products with Lavatec, Old Lavatec ordered nameplates bearing the Lavatec mark from Lavatec Germany and affixed them to the equipment it manufactured and most of the products it sourced from non-Lavatec third parties.  (*Id.*)

Old Lavatec also designed and sold what defendant described at trial as "laundry systems."  These systems—custom configurations of laundry equipment and machinery—were

---

[3] Old Lavatec averaged $13.5 million in sales of Lavatec products per year, not including spare parts and service, which averaged over $5 million per year from 1995 to 2009.  (Ex. 500.)

[4] Old Lavatec sales of these folders averaged over $1 million per year over the course of

designed by Old Lavatec's sales and engineering staff with assistance from Lavatec Germany technicians.  (Test. of P. Thompson, May 20, 2014, 2014; Ex. 639.)  Generally, a laundry system design included schematic drawings of the machinery, the space in which the machines were to be installed, power and water requirements, and a list of components.  (Test. of M. Thrasher, May 19, 2014; Exs. 150, 643, 645, 683, 685.)  The design layouts were augmented by technicians and engineers at Lavatec Germany, who designed other aspects of the system such as the software system, power and water supply systems, and interconnections among the system's components.  (Test. of Ben ten Have, May 22, 2014.)  Although the systems were composed primarily of Lavatec Germany products and branded with the Lavatec mark, some components were manufactured by Old Lavatec or purchased from third parties.  (*Id.*)

Both Lavatec Germany and Old Lavatec marketed and advertised Lavatec products in the United States.  Lavatec Germany was advertised to the public as a German company that supplied the United States with Germany-sourced products and service.  Similarly, and from early in its inception, Old Lavatec held itself out to the public as part of a group of entities "backed by two production factories in West Germany" and as part of a company that employed 130 people among its three facilities (Exs. 605, 606), and as the source of Lavatec products in the United States (Exs. 556, 667).  In its earliest days, Old Lavatec had no advertising material of its own (Test. of P. Thompson, May 20, 2014), and Lavatec Germany initially created marketing material for use in English-speaking markets (Test. of G. Bernecker, May 20, 2014).  Eventually, Tadros would oversee and approve Old Lavatec marketing and advertising efforts, which were

15 years.  (Ex. 500.)

paid for by Old Lavatec.[5]  (Test. of P. Thompson, May 20, 2014; Test. of J. Stork, May 22, 2014.)

Some of Old Lavatec's earliest marketing and advertising efforts in the United States occurred in 1987, when Old Lavatec began participating in national exhibitions of laundry equipment called "Clean Shows."  (Test. of P. Thompson, May 20, 2014.)  Old Lavatec was the only Lavatec entity that participated in the Clean Shows, though representatives of Lavatec Germany attended the Clean Shows at Old Lavatec's invitation.   (Test. of P. Thompson, May 21, 2014; Exs. 559, 579, 591.)  Old Lavatec identified itself in trade show documents as "the U.S. subsidiary of Lavatec Waeschereimaschinen GmbH, with its headquarters in Heilbronn, Germany" and the "sole importer of Lavatec equipment into North America [running] sales, service and spare-parts operations."  (Ex. 113.)  Old Lavatec also displayed Lavatec equipment that it either bought or borrowed from Lavatec Germany, and emphasized its connection with Germany, not only by noting the German origin of many of its products, but also by importing German wines and serving them to potential customers.  (Test. of P. Thompson, May 21, 2014; Ex. 113.)

Although Old Lavatec was meant to be the primary service provider for Lavatec users in the United States, Lavatec Germany also provided technical services and spare parts to United States customers.  (Test. of F. Esslinger, May 20, 2014; *see* Exs. 604, 605, 606.)  Technicians from Lavatec Germany would occasionally travel to the United States to service and repair Lavatec products.  (Test. of M. Thrasher, May 20, 2014; Ex. 640.)  Further, U.S. customers would often call Lavatec Germany personnel directly in Germany to troubleshoot issues.  (*Id.*)

---

[5]  From 1995 to 2009, Old Lavatec's yearly advertising expenditures, not including trade shows, averaged approximately $70,000.  (Ex. 502.)  During that same period, Old Lavatec spent more than $2.5 million on trade shows, for an average of over $400,000 per year in total

When Lavatec Germany technicians were sent to service U.S. customers, however, Old Lavatec would bill the customer and, in turn, Lavatec Germany would bill Old Lavatec for the cost of its technicians.  (Test. of P. Thompson May 21, 2014; Exs. 638, 639).  When U.S. customers purchased Germany-sourced equipment from Old Lavatec, Lavatec Germany sold that equipment to Old Lavatec but shipped it directly from Germany to the end-user.  (Test. of M. Thrasher, May 20, 2014.)  Both Old Lavatec and Lavatec Germany personnel were involved in the shipping process.  (*Id.*)  During shipment, Old Lavatec would inspect the product to ensure that the correct equipment had been shipped and that no damage had occurred during the shipping process.  (*Id.*)  When the equipment arrived at the end-user, the customer was typically responsible for unloading the product.  (*Id.*)  Old Lavatec generally installed the equipment, except where the expertise of technicians or engineers from Lavatec Germany was needed.  (*Id.*)  The Lavatec entities also shared responsibility for the execution of product warranties.  Old Lavatec reported warranty claims, structural failures and issues with Lavatec Germany equipment to Germany.  (Test. of M. Thrasher, May 19, 2014.)  Depending on the severity of the problem, Lavatec Germany technicians traveled to the United States or the customer would send the damaged part to Old Lavatec, which would send that part to Lavatec Germany for inspection and replacement, repair, or reimbursement.  (*Id.*)

    B.  <u>First Use of the Lavatec Mark in the United States</u>

    Prior to the incorporation of Old Lavatec, Germany- and U.S.-based Lavatec representatives were involved in the sale of laundry equipment to Shared Hospital Services, a hospital laundry in Portsmouth, Virginia.  (Exs. 20, 519-21, 525.)  Jim Stork, a former Passat employee and regional vice president at Old Lavatec, testified that prior to the incorporation of

---

advertising expenses.  (*Id*.)

Old Lavatec, he attended a meeting in California at which he discussed with Tadros the formation of a laundry company.  (Test. of Jim Stork, May 22, 2014.)  After being hired at Old Lavatec, Stork pursued former Passat customers, including Shared Hospital Services, with which he arranged a meeting.  (*Id.*)  Because there were then no advertising brochures available, Tadros helped Stork to prepare for that meeting by providing him with specifications for Lavatec products.  (*Id.*)  On January 21, 1987, Peter Thompson, who was then the office manager of yet-to-be-incorporated Old Lavatec, sent an order confirmation to Shared Hospital Services for Lavatec laundry equipment (Exs. 526-530), and on February 12, 1987, Old Lavatec sent its first order for equipment to Lavatec Germany, stating "[w]e shall do our utmost to keep you all busy in the future" (Ex. 521).  Bernecker testified that the Shared Hospital Services sale was made on behalf of Lavatec Germany as well, an assertion supported by the inclusion of Shared Hospital Services on a contemporaneous list of Lavatec Germany customers.[6]  (Test. of G. Bernekcer May 20, 2014; Ex. 20.)

     C.  <u>The Lavatec Bankruptcies and Asset Purchase Agreements</u>

Lavatec Germany filed for bankruptcy in Germany in 2009, after nearly twenty-five years of operation.  (Joint Trial Memo, Stip. of Fact ¶ 7.)  A temporary insolvency administrator for Lavatec Wäschereimaschinen GmBH & Co. KG was appointed on May 7, 2009, and a second insolvency administrator was appointed for Lavatec GmbH on June 8, 2009.  (Ex. 657.)  The business of Lavatec Wäschereimaschinen GmBH & Co. KG was closed in June 2009.  (Ex. 637.)  During its bankruptcy proceedings, Lavatec Germany continued to sell spare parts, existing inventory of Lavatec products, and technical services under the Lavatec mark, but it stopped

---

[6] Bernecker also testified that Lavatec Germany sent personnel to the United States in January of 1987 to service Passat machines owned by the Consultex corporation.  (Test. of G. Bernecker, May 20, 2014.)

manufacturing products.  (Test. of P. Naumann, May 20, 2014.)  Old Lavatec filed for

bankruptcy on July 24, 2009, in part due to its inability to acquire new equipment from Lavatec

Germany, but continued operating as a debtor-in-possession, servicing existing customers and

selling spare parts from its inventory.  (Test. of H. Bernstein, May 22, 2014; Test. of P.

Thompson, May 21, 2014; Ex. 500.)

Lavatec Germany's insolvency administrators began looking for buyers, and in July

2009, Graeser began to consider purchasing Lavatec's operations out of insolvency, including

Old Lavatec.  (Test. of W. Graeser, May 19, 2014; Test. of P. Naumann, May 20, 2014.)  After

encountering difficulty financing the purchase, Graeser began negotiating with insolvency

administrators to purchase only the German entities.  (Test. of P. Naumann, May 20, 2014; Test.

of Graeser, May 19, 2014; Ex. 608.)  In May 2010, Graeser entered into an Asset Purchase

Agreement to purchase Lavatec Germany's assets.  With the exception of a manufacturing

facility in Saarstedt, Germany and Lavatec Germany's feeder and folder portfolio, LLT

purchased all of the assets of Lavatec Germany.  LLT also kept most of Lavatec Germany's

employees, including its engineers and manufacturing staff.  LLT, however, did not purchase

Old Lavatec.

The Asset Purchase Agreement did not expressly include any United States trademark, or

any assets or stock of Old Lavatec.  (Test. of W. Graeser, May 19, 2014; Ex. 637.)  Moreover,

the Asset Purchase Agreement stated that Lavatec Germany did not have the exclusive right to

the trade name "Lavatec" everywhere, including in the United States.  Part 4, Section 3 of the

Asset Purchase Agreement, titled "Liability for Defects" reads, in relevant part:

> Seller 1 [Insolvency Trustee of Lavatec GmbH] puts Buyer [LLT] on notice that Debtor 1
> [Lavatec GmbH] does not have the exclusive right to the exclusive designation "Lavatec"
> because Lavatec, Inc., USA and Lavatec France also have the right to continue to use
> their respective trade names.

(Ex. 637.)

In September 2009, after the filing of Old Lavatec's bankruptcy petition, Old Lavatec's accountant, Herman Bernstein, became aware that the Lavatec mark had not been registered in the United States.  (Test. of H. Bernstein, May 22, 2014.)  Up to that point, no Lavatec entity had applied to register the mark in the United States, included it as an asset on its financial statements, or entered into any agreement or promulgated a policy concerning use of the mark. On March 11, 2010, Bernstein applied to register the Lavatec mark, without the knowledge or authorization of Lavatec Germany or of Old Lavatec's Board of Directors (which included the German insolvency administrators of Lavatec Germany), and without discussing the filing of the application with the United States or German bankruptcy trustees.[7]  (*See* Test. of H. Bernstein, May 22, 2014; Test. of P. Naumann, May 20, 2014; Exs. 104, 170.)  Thus, when Graeser sought to register the Lavatec mark on behalf of LLT in Europe and elsewhere in the world, he found that there was a pending application to register the mark in the United States.[8]  (Test. of W. Graeser, May 19, 2014.)

The Asset Purchase Agreement is dated May 26, 2010, but did not go into effect until September 2010.  Pursuant to Part 4, Section 1 of that agreement, the insolvency administrator for Lavatec GmbH sold to LLT:

---

[7] Bernstein testified that Tadros authorized him to file the trademark application in March 2010.  There is no evidence of that authorization other than Bernstein's testimony.  (Test. of H. Bernstein, May 22, 2014.)  Tadros had been removed as president and chief executive officer of Old Lavatec on July 24, 2009.  (Ex. 612.)

[8] Graeser briefly considered purchasing Old Lavatec and visited the United States to inspect the facility.  (Test. of W. Graeser, May 19, 2014.)   Bernstein testified that during Graeser's visit, he told Graeser that Old Lavatec owned the Lavatec mark in the United States. (Test. of H. Bernstein, May 22, 2014), but Graeser did not take Bernstein's claim seriously. (Test. of W. Graeser, May 19, 2014).

> [a]s the case may be, existing intellectual property rights, e.g., trademarks, patents, drawings, plans and general business records; this is also true for not yet registered rights, e.g., intellectual property rights that have been applied for.  The sale does not include the trademark "Dunnewolt."  Seller 1 advises the Buyer that intellectual property rights were sold in connection with the closing of another purchase agreement and that no registered intellectual property rights are known at this time.

(Ex. 637.)  On September 17, 2010, Graeser sent a cease and desist letter to Old Lavatec, demanding that it withdraw its application to register the mark.  (Test. of W. Graeser, May 19, 2014; Ex. 616.)  After the receipt of that letter, Old Lavatec amended the schedule of property of the bankruptcy petition to add the mark as an asset.  (Test. of H. Bernstein, May 22, 2014.)  LLT filed an opposition to Old Lavatec's trademark application with the Trademark and Trial Appeal Board of the United States Patent and Trademark Office and also filed United States trademark applications for the Lavatec word and design mark on September 24, 2010 and December 22, 2011, respectively.  (Test. of W. Graeser, May 19, 2014.)

On April 8, 2011, Old Lavatec entered into an asset purchase agreement with prospective buyers, and on June 1, 2011, the United States Bankruptcy Court authorized Old Lavatec to enter into and consummate that agreement.  (Stip. of Fact at Trial.)  Although Old Lavatec did not include the mark as an asset in its initial bankruptcy petition in August 2009, on April 13, 2011 Old Lavatec amended the petition to include the mark.  (Stip. of Fact at Trial; Exs. 52, 508.)  On July 28, 2011, Bernstein assigned the trademark application to Laundry Acquisition, Inc., which became defendant New Lavatec.  (Ex. 632.)

## II.    Discussion

Trademark rights are generally acquired through priority of use.  *ITC Ltd. v. Punchgini, Inc.*, 482 F.2d 135, 146-47 (2d Cir. 2007); *Sengoku Works Ltd. v. RMC Int'l*, 96 F.3d 1217, 1219 (9th Cir. 1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use.").  When parties are "related," however, the law allows the entity that controls the use of the

mark to claim the benefit of that use as well as ownership of the mark.  *See* 15 U.S.C. §§ 1055,

1127.  The Lanham Act provides:

> Where a . . . mark sought to be registered is or may be used legitimately by related
> companies, such use shall inure to the benefit of the . . . applicant for registration, and
> such use shall not affect the validity of such mark or of its registration, provided such
> mark is not used in such manner as to deceive the public.  If first use of a mark by a
> person is controlled by the . . . applicant for registration of the mark with respect to the
> nature and quality of the goods or services, such first use shall inure to the benefit of the
> registrant or applicant . . . .

15 U.S.C. § 1055.  A "related company" is "any person whose use of the mark is controlled by

the owner of the mark with respect to the nature and quality of the goods or services on or in

connection with which the mark is used."  15. U.S.C. § 1127.

When the parties are a manufacturer and a distributor, courts will look first to the

agreement between the parties regarding trademark rights.  *Sengoku Works Ltd.*, 96 F.3d at 1220.

In the absence of an agreement, the manufacturer is presumed to own the trademark, unless the

distributor can establish a superior right of ownership by demonstrating other factors, including

control of the quality of the product.  *Id.*

Here, the parties agree that the related companies doctrine could apply, but dispute

whether the *Sengoku Works* factors should apply and which entity first used the mark in the

United States.  If defendant can establish priority of use and the related companies doctrine

applies, then I must determine which party controlled the mark with respect to the nature and

quality of the goods and services offered.  I must perform the same analysis if the priority of use

is indeterminate.  *Arredondo v. Arredondo*, 2010 WL 4929250, at *6 (D. Conn. Nov. 30, 2010),

*aff'd,* 460 F. App'x 59 (2d Cir. 2012) ("[W]hether examining related companies, joint endeavors,

or even relationships between manufacturers and distributors, to determine the ownership of  a

trademark in the situation where 'first use' is indeterminable, district courts focus primarily on

the issue of 'control'—not actual legal control, but rather who controlled the mark with respect to the nature and quality of the goods offered.").

In the alternative, plaintiff argues, I should examine the *Sengoku Works* factors, which apply in the context of a trademark dispute between a manufacturer and a distributor. Those factors include: (1) which party invented and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; (4) which party the public identified with the product and to whom purchasers made complaints; and (5) which party possesses goodwill associated with the product, or which party the public believes stands behind the product. *Sengoku Works*, 96 F.3d at 1220. Defendant denies that it was the distributor for Lavatec Germany, which was composed of two entities—a holding company, Lavatec AG, and another entity, Lavatec Wäschereimaschinen GmBH & Co. KG. Instead, defendant admits to having been a sister company of the manufacturing entity and a distributor for Lavatec AG. (Ex. 104.) The parties agree, however, that Old Lavatec was a wholly-owned subsidiary of Lavatec Germany. Because plaintiff purchased the assets of both German companies, it is irrelevant whether Old Lavatec was a distributor for the holding company or the manufacturing entity. The issue is whether either German entity owned the mark. In any event, because Old Lavatec was, at times, not merely a distributor for Lavatec Germany but also manufactured products, I will apply the related companies doctrine.

"The hallmark of related companies is control over use of the mark . . . ." *Rockland Exposition, Inc. v. Alliance of Automotive Serv. Providers*, 894 F. Supp. 2d 288, 309-10 (S.D.N.Y. 2012). The mere fact that the related companies are a parent corporation and its wholly-owned subsidiary is insufficient to establish that the parent corporation is owner of the mark because related companies may agree that the wholly-owned subsidiary rather than the

parent corporation is owner of the mark.  *See id.*  The parties admit that there was no explicit

agreement entered into between Lavatec Germany and Old Lavatec granting the subsidiary

ownership of the mark.  Accordingly, I must examine which entity first used the mark and, then,

which entity controlled the mark with respect to the quality of the goods or services provided.

      A. <u>Priority of Use</u>

First use generally determines who owns a trademark.  *ITC*, 482 F.3d at 146-47.  "[S]o

long as a person is the first to use a particular mark to identify his goods or services in a given

market, and so long as that owner continues to make use of the mark, he is 'entitled to prevent

others from using the mark to describe their own goods' in the market."  *Id.* at 147; *Lab Corp. of*

*Am. v. Schumann*, 2009 WL 275859, at *3 (D. Conn. Feb. 4, 2009) ("[T]he test of trademark

ownership is use in a market, and that use must be first and it must be continuous.").  The

Lanham Act defines "use in commerce" as:

> the bona fide use of a mark in the ordinary course of trade, and not made merely to
> reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in
> use in commerce-- (1) on goods when--  (A) it is placed in any manner on the goods or
> their containers or the displays associated therewith or on the tags or labels affixed
> thereto, or if the nature of the goods makes such placement impracticable, then on
> documents associated with the goods or their sale, and (B) the goods are sold or
> transported in commerce, and (2) on services when it is used or displayed in the sale or
> advertising of services and the services are rendered in commerce, or the services are
> rendered in more than one State or in the United States and a foreign country and the
> person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127.  Use of the mark must not be "sporadic" or "causal."  *See Sadhu Singh*

*Hamdard Trust v. Ajit Newspaper Adver. Marketing, and Comm'ns*, 394 F. App'x 735, 736 (2d

Cir. 2010) (use must be "deliberate" and "the kind of bona fide use intended to afford a basis for

trademark protection"); *see also La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*,

495 F.2d 1265, 1274 (2d Cir. 1974) ("Trademark rights are not created by sporadic, casual, and

nominal shipment of goods bearing a mark.").

There is no dispute that the Lavatec mark was invented and first used in Germany.  Both parties, however, contend that they were the first user of the Lavatec mark in the United States. Which Lavatec entity first used the mark in the United States is important because a "trademark has a separate legal existence under each country's laws," and a foreign mark holder generally may not assert priority rights under federal law unless it has used that mark in the United States. *ITC*, 482 F.3d at 155-56; *see also Ajit Newspaper*, 394 F. App'x at 736 ("[F]oreign use is ineffectual to create trademark rights in the United States.") (citing *La Societe Anonyme*, 495 F.2d at 1270)).  Defendant contends that Old Lavatec became the first entity to use the mark in commerce in the United States when it sold laundry equipment bearing the mark to Shared Hospital Services.[9]  The plaintiff argues that Lavatec Germany first used the mark, based on the same sale of the laundry equipment to Shared Hospital Services.  Further, plaintiff argues, Old Lavatec's purported first use of the mark occurred before Old Lavatec was actually incorporated in the United States.

At the time of Old Lavatec's purported first use of the mark, Lavatec Germany had already opened offices and manufacturing facilities, produced and disseminated marketing materials for its products, manufactured industrial dryers and extraction presses, and created a wholly-owned subsidiary, Old Lavatec, to distribute its products in the United States.  Old Lavatec, in contrast, was not yet incorporated, had no marketing materials, and did not manufacture or assemble any products until four years later.  Defendant's claim that Old Lavatec first used the mark in the United States rests solely on its solicitation of early U.S. customers of

---

[9] Defendant also suggests that its sale of a laundry system to Jewish Home and Hospital during that period could also constitute the first use of the mark in the United States.  The sale to Shared Hospital Services preceded the sale of the laundry system to Jewish Home and Hospital. Further, both Lavatec entities were involved in the creation of the laundry systems sold to Jewish Home and Hospital.

Lavatec products.  Stork, the former Passat employee responsible for the Shared Hospital

Services account who eventually became a vice president at Old Lavatec, testified that he met

with Shared Hospital Services and brought them to Old Lavatec (although Old Lavatec was not

incorporated at the time).  That purported first use of the mark was by Old Lavatec only in the

sense that Stork was working on behalf of a subsidiary that Lavatec Germany created specifically

to provide Lavatec products and services for U.S. customers.  Bernecker, the first chief executive

officer of Lavatec Germany and a director of Old Lavatec, testified at trial that each United

States customer was a customer of "Lavatec," rather than solely a customer of Old Lavatec, and

documentary evidence presented at trial showed that Lavatec Germany listed Shared Hospital

Services as its customer in January 1987, the same period during which Old Lavatec claimed

Shared Hospital Services to be its first customer.[10]  (Ex. 20.)  Finally, the products that Old

Lavatec allegedly sold to Shared Hospital Services customers were manufactured *in* Germany *by*

Lavatec Germany and bore the mark *associated with* Lavatec Germany.

It is clear to me that defendant has not established a first use claim to ownership of the

mark.  Still, in the interests of putting the dispute over ownership of the mark to rest, I will also

examine other factors to determine which entity was entitled to trademark protection.  To do so, I

turn to the related companies doctrine, which, unlike the *Sengoku Works* test, does not require

defendant to overcome a presumption of trademark ownership in favor of the manufacturer,

Lavatec Germany.  Under the related companies doctrine, in circumstances where first use of the

---

[10] Bernecker also testified that in the period between the founding of Lavatec Germany
and the founding of Old Lavatec, a U.S. customer contacted him to discuss whether Bernecker
would be able to send technicians to service machines manufactured by the former Passat
company, and that Lavatec Germany sent a technician to the United States in January 1987 to
service Passat machines.  Further, Bernecker testified that he issued Lavatec invoices from
Germany to the United States in December 1986 and January 1987 and also claimed that prior to
February 2, 1987, potential U.S. customers visited Lavatec Germany and were offered Lavatec

mark is indeterminate, I must balance the equities to determine who controlled the mark with respect to the nature and quality of the goods or services offered.  *Arredondo*, 2010 WL 4929250, at *6.

    B.  <u>Control of Use of the Mark</u>

Defendant stipulates that Lavatec Wäschereimaschinen GmBH & Co. KG, the German manufacturing entity, controlled the use of the mark with respect to the quality of the products that Lavatec Germany manufactured, but argues that neither German entity controlled other products that Old Lavatec sold under the mark in the United States.[11]  Def.'s Post Trial Br. at 26 (doc. # 110).  Under defendant's theory, because Lavatec Germany did not control the use of the mark with respect to the Old Lavatec-manufactured and sourced products, it relinquished any claims to ownership of the mark.  The facts presented at trial show otherwise.  Although there is no direct evidence that Lavatec Germany placed formal restrictions on the use of the mark, Lavatec Germany was involved in virtually all of the activities that defendant argues demonstrate Old Lavatec's unrestricted use of the mark.  Nor is there any evidence to show that Lavatec Germany ever relinquished control of the mark to Old Lavatec.

Before turning to Old Lavatec's use of the mark, it is important to note again that, for the first four years of its existence, Old Lavatec did not control the use of the mark with respect to *any* goods.  All of the goods Old Lavatec sold between 1987 and 1991 were sourced from Lavatec Germany and identified to the customers as having originated in Germany.  The only goods Old Lavatec could offer at the time were machines manufactured by Lavatec Germany—

---

products for sale.

    [11] There were at least four products that Old Lavatec sold under the Lavatec mark that were not bought from Lavatec Germany: the BB&D folders Old Lavatec manufactured and sold beginning in 1991; the washer extractors it assembled between 1995 and 1997; the WashEx folders Old Lavatec sold from 2005 until its bankruptcy; and the third-party conveyors sold

the quality of which Lavatec Germany necessarily controlled.  Old Lavatec did not even begin to manufacture any of its own goods, to which the Lavatec mark was attached, until years after it began selling Lavatec products and services.

Even after Old Lavatec began to manufacture or source goods in the United States, Lavatec Germany continued to control the use of the mark with respect to the majority of the products that Old Lavatec sold.  Thus, in order to apply the related companies doctrine in favor of defendant, I must find that, after four years of being a distributor of Lavatec products, Old Lavatec's application of the mark to the relatively small proportion of equipment it manufactured or assembled shows that Lavatec Germany gave Old Lavatec free reign to use the mark in the United States.  Neither plaintiff nor defendant presented any strong evidence on the question who determined to what equipment and how the nameplate bearing the Lavatec mark would be affixed to equipment sold by Old Lavatec.   There is no evidence that Lavatec Germany endorsed or controlled the decision to apply the Lavatec mark to third-party or Old Lavatec equipment other than:  (1) by an inference arising from the fact that Lavatec Germany sent nameplates bearing the Lavatec logo and mark to Old Lavatec or (2) through a suggestion that Lavatec Germany instructed Old Lavatec where to place the nameplates on the equipment.  With respect to the latter evidence, there was no documentary evidence presented at trial showing that Lavatec Germany instructed Old Lavatec how to use the mark on the equipment, other than by providing schematic drawings showing where to affix the marks to the machines.  And the instructions showing how to apply the mark do not meaningfully demonstrate that Lavatec Germany controlled the mark with respect to the quality of the U.S.-sourced equipment.  Moreover, although it is likely that Lavatec Germany would not have sent nameplates bearing the logo or

_____

under the Lavatec name as part of laundry systems designed by Old Lavatec.

mark to Old Lavatec without some assurance that the nameplates were not being affixed to sub-par equipment, no such evidence was presented at trial.  Nor was there any evidence showing that Lavatec Germany ever denied Old Lavatec the right to affix the nameplate.  The fact weighing most strongly in favor of plaintiff with respect to the nameplates is that Lavatec Germany designed the mark and was the only entity to manufacture the nameplates.

Defendant also contends that the laundry systems Old Lavatec sold to U.S. customers were products for which Old Lavatec controlled the use of the mark.  Setting aside the question whether the laundry systems were goods rather than services, or whether a laundry system is a single product or comprises multiple products, that argument fails for many of the same reasons described above.  Old Lavatec did not exercise independent control over the use of the mark with respect to the quality of the goods and services associated with the laundry systems.  Lavatec Germany technicians completed the laundry system designs and even added elements to the designs that were integral to their quality and function, such as software systems.  The Lavatec mark was indeed affixed to most of the components of these systems and, although only Old Lavatec sold these systems to U.S. customers, Lavatec Germany was heavily involved in the production and servicing of them.

Nor did Old Lavatec control use of the mark with respect to the services it provided to U.S. customers.  Old Lavatec was permitted to use the mark, but Lavatec Germany was frequently called in to assist Old Lavatec technicians and participated in the shipment and installation of equipment.  Both entities serviced customers, but Lavatec Germany had technicians who were responsible for aspects of the equipment that Old Lavatec could not service, such as the equipments' software.  Bernecker testified that U.S. customers toured Lavatec Germany's production facilities and that when issues with Lavatec products arose, he

would give technical instructions to Old Lavatec, or would decide to send technicians from Germany to the United States.

Defendant's strongest argument that Old Lavatec controlled the use of the mark in the United States is Old Lavatec's eventual control over the advertising of Lavatec products and services to U.S. customers.  That argument fails for many of the same reasons its arguments fail with respect to sales, manufacturing, and customer service.  The final decision maker with respect to advertising was Tadros, who also controlled Lavatec Germany; the products advertised were primarily products manufactured by Lavatec Germany; and even in marketing and advertising, Old Lavatec did little to distinguish itself from Lavatec Germany and, indeed, stressed its connection to Lavatec Germany.

The circumstances surrounding the companies' insolvencies and the execution of the asset purchase agreement do not save defendant's claim to the right of ownership of the mark. Notwithstanding Bernstein's claim that Tadros authorized or that the insolvency administrators ratified the registration, sale, or claim of ownership of the mark, there is no evidence that anyone at any Lavatec entity authorized the application for registration, much less gave Bernstein the right to include the mark as an asset of Old Lavatec.  The Asset Purchase Agreement included the sale of all of the intangible intellectual property rights of Lavatec Germany, including "rights that have been applied for," and thereby transferred all intellectual property rights of Lavatec Germany to New Lavatec.[12]  Defendant also argues that a clause in the Lavatec Germany Asset Purchase Agreement constitutes an admission by the insolvency administrator and an acknowledgment by Lavatec Germany that Old Lavatec possessed the exclusive right to the

_____

[12] The agreement also noted that certain intellectual property rights had been sold in connection with another purchase agreement and that no registered intellectual property rights were known at the time.  That notification does not refer to the sale of Old Lavatec, which was

mark.  That clause, titled "Liability for Defects," was meant to protect the insolvency administrator from liability for defects in the sale, in this case, by notifying the seller that other entities, including Old Lavatec, had the right to use the trade name "Lavatec" as a corporate designation.  That clause is limited to the Lavatec trade name and says nothing about rights to ownership of the mark.  A trade name is simply a name used to identify an entity, whereas as a trademark "includes any word, name, symbol, device, or combination thereof" used to identify a good and its origin.  11 U.S.C. § 1127.

After carefully considering the evidence of record, I find that Lavatec Germany was the first to use the Lavatec mark in the United States.  Old Lavatec and Lavatec Germany both claim the same sale of Lavatec products as their first use of the mark in the United States.  At the time of that sale, Old Lavatec, which had not yet been incorporated, was acting as the distributor for Lavatec Germany and, therefore, the sale was ultimately a sale for Lavatec Germany.  Even if I were to conclude that neither party could establish first use of the mark, the related companies doctrine defeats defendant's claim that Old Lavatec owned the mark.  Lavatec Germany—which was already manufacturing and advertising products when the first Lavatec sale in the United States occurred—controlled the use of the mark with respect to the quality of the goods and services offered.  At no time between the creation of the Lavatec name and the first sale of Lavatec products until its insolvency did Lavatec Germany relinquish that right.  Consequently, neither Old Lavatec nor Lavatec, Inc. acquired any right of ownership in the mark, and plaintiff LLT, which acquired all of the intellectual property rights of Lavatec Germany, now holds the exclusive ownership of the mark in the United States.

## III.   Conclusion

not sold until the following year.

I find in favor of plaintiff Lavatec Laundry Technology, GmbH on the issue of ownership of the mark.  A declaratory judgment shall issue that LLT is owner of the mark.

All pending motions (docs. # 38, 44, 49, 60, 65, 101) are denied as moot.

It is so ordered.

Dated at Bridgeport, Connecticut, this 3rd day of September 2014.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge